**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

██████████████████████████

Civil Action No. 20-cv-01492-STV

FUEL AUTOMATION STATION, LLC,

      Plaintiff,

v.

FRAC SHACK INC.,

      Defendant.

---

## ORDER

Entered By Magistrate Judge Scott T. Varholak

      This civil action is before the Court on the Motion for Partial Summary Judgment for Declaratory Relief [##50, 52] (the "Summary Judgment Motion") and the Motion for Preliminary Injunction ("the Injunction Motion") [##53, 55], both filed by Plaintiff Fuel Automation Station, LLC ("FAS") (collectively, the "Motions"). The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [#30, 31]  The Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that neither oral argument nor an evidentiary hearing would materially assist in the disposition of the Motions.  For the following reasons, the Injunction Motion is **DENIED** and the Summary Judgment Motion is **GRANTED IN PART and DENIED IN PART.**

I.    **BACKGROUND**[1]

This case arises out of the parties' disputes regarding a settlement agreement entered into by FAS and Defendant Frac Shack Inc. ("Frac Shack") to resolve patent litigation.  [*See generally* #3, 52-2]  FAS "manufactures and provides services related to an automated frac fuel delivery system known as the Fuel Automation Station" (the "FAS Equipment").  [#71-1, SOF1]  FAS and Frac Shack are competitors.  [*Id.* at SOF10]

On October 19, 2016, Frac Shack sued FAS in this District alleging infringement of United States Patent number 9,346,662 (the "'662 patent") based upon FAS's activity related to the FAS Equipment.  [*Id.* at SOF2; #52-2 at 2; *see also Frac Shack Inc. v. Atlas Oil Company*, Case No. 16-cv-02275-STV (D. Colo. 2016), #30]  On June 4, 2018, Frac Shack filed United States patent application number US 15/997,340 (the "'340 application").  [#52-2 at 2]  On July 24, 2018, Frac Shack sued FAS in the United States District Court for the Southern District of Texas alleging infringement of United States Patent number 10,029,906 (the "'906 patent") based upon FAS's activity related to the FAS Equipment.   [#71-1, SOF3; #52-2 at 2; *see also Frac Shack Inc. v. Atlas Oil Company*, Case No. 18-cv-02566 (S.D. Tex. 2018)]

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with FAS's reply in support of the Summary Judgment Motion.  [#71-1]  The Court refers to the sequentially numbered facts set forth in the Statement of Facts as "SOF#."  Defendant failed to respond to each of the facts set forth in the Separate Statement of Facts as required by this Court's Practice Standards and instead included a "Disputed Facts" section in its brief that addressed only eight of the 16 facts FAS set forth in the Statement of Facts.  [#64 at 7-8]  The Court accepts and considers Defendant's responses to these eight facts, but considers all of the remaining facts to be undisputed.  The Court periodically cites directly to the exhibits cited by the parties in the Statement of Facts to provide additional context.  The Court also draws facts from the Complaint [#3] and evidence submitted in support of the Injunction Motion [#53-1 through #53-6] as necessary to provide context for resolution of the pending Motions.

On July 13, 2019, FAS and Frac Shack entered into a confidential, written settlement agreement (the "Agreement"), in which the parties reached a complete settlement of both of the patent infringement lawsuits.[2]  [#71-1, SOF4; #52-2]  Pursuant to the Agreement, ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████  [#71-1, SOF5, SOF6]  More specifically, with regard to the Covenant Not to Sue, the Agreement states:



[#52-2 at 3]  "Frac Shack Patent Rights" are defined as follows:



[*Id.* at 2]

As part of the Agreement, Frac Shack and FAS agreed on the language for a press release (the "Press Release") to describe the terms of the Agreement.  [#71-1, SOF9] The Press Release was made an exhibit to the Agreement and states as follows:

> Atlas Oil Company and its affiliate [FAS], together with [Frac Shack], announced that they have reached a complete settlement of the patent infringement lawsuits that were pending in the United States District Courts for the District of Colorado and the Southern District of Texas.  Under the

_____

[2] The Agreement "is between [Frac Shack], on the one hand, and Atlas Oil Company and [FAS] (collectively, 'Atlas'), on the other."  [#52-2 at 2]  For purposes of the instant Motions, the Court refers to FAS and Atlas—as defined in the Agreement— interchangeably as FAS.

terms of the [Agreement], neither Party conceded infringement or violation of any laws, and both Parties are expressly permitted to manufacture, use, sell, lease, and license their respective mobile automated fuel distribution units utilized in the fracking industry. The remaining terms of the Agreement are confidential.

[#52-2 at 16]

The Agreement further provides that 

*Id.* at 7]

On May 26, 2020, FAS filed the instant lawsuit against Frac Shack, asserting the following three claims: (1) declaratory judgment that, pursuant to the Covenant Not to Sue, FAS is authorized to sell or lease the FAS Equipment and Frac Shack cannot sue customers, lessees, or users of that FAS Equipment, (2) breach of the Agreement based upon Frac Shack suing KVA Fuel Services Ltd. ("KVA"), an authorized downstream user of the FAS Equipment, in Canada (the "Canadian Lawsuit") for allegedly infringing Canadian Patent No. 2,693,567 (the "CA '567 Patent") and (3) breach of the Agreement based upon Frac Shack suing KVA and thereby engaging FAS in litigation.  [#3 at 7-11] Based upon these claims, the Complaint seeks the following relief:  (1) a declaration clarifying the parties' rights under the Agreement, (2) damages for the alleged breaches of the Agreement, including costs, attorneys' fees and interest, and (3) an order requiring Frac Shack to dismiss the Canadian Lawsuit.  [*Id.* at 12]

On August 25, 2020, Frac Shack filed the Motion to Dismiss All Claims (the "Motion to Dismiss"), seeking dismissal of all of FAS's claims for lack of subject matter jurisdiction, failure to state a claim, and pursuant to international comity and the Court's declaratory

judgment discretion.  [#14]  On March 12, 2021, the Court issued an Order denying the Motion to Dismiss in its entirety.  [#41]

In March and April 2021, counsel for Frac Shack sent letters to Jacobs Petroleum Products, Inc. ("Jacobs"), Creek Oilfield Services ("Creek"), and NewKota Services & Rentals ("NewKota") [#71-1, SOF12], which letters stated that their purpose was "to put [Jacobs/Creek/NewKota] on notice that by [using and operating FAS Equipment] it may be liable for infringement of Frac Shack's patents" [#50-6 at 2, 4, 6].  The letters further stated that "Frac Shack's position in [this] litigation is that customers of FAS, such as [Jacobs/Creek/NewKota], are not covered [by the Agreement], would not be allowed to use or acquire the FAS [Equipment], and would be infringers of Frac Shack's patents by doing so."  [*Id.*]  The letters further stated that "Frac Shack is confident in its position" and that "[i]f Frac Shack ultimately prevails in [this] litigation . . ., Frac Shack's view is that [Jacobs/Creek/NewKota] will be liable for infringement of at least the '662 and '906 patents for operating the FAS [Equipment]."  [*Id.* at 3, 5, 7]  The letters concluded by requesting that Jacobs, Creek, and NewKota "let [counsel for Frac Shack] know by [April 2021] if [Jacobs/Creek/NewKota] is willing to engage in [licensing discussions] to resolve this matter amicably."  [*Id.*]  After receiving the letters, Jacobs, Creek, and NewKota each wrote emails to FAS expressing their concern about the letters and, in response, representatives of FAS, including internal counsel, spoke with representatives of Jacobs and Creek about the letters.  [#71-1, SOF 15, SOF16; #50-7][3]

---

[3] Although Frac Shack responded to these statements of fact by stating that it "does not have sufficient information at this time to determine whether [the] statement is accurate" [#64 at 8], Frac Shack has not filed an affidavit or declaration explaining why the facts are unavailable to it as required by Federal Rule of Civil Procedure 56(d).

On April 28, 2021, FAS filed the Injunction Motion and the Summary Judgment Motion.  [#52, 55]  On May 19, 2021, Frac Shack filed its responses to the Motions [#64, 67], and FAS then filed replies in support of the Motions [#71, 74].

## II.   ANALYSIS

### A.   Injunction Motion

#### 1.   Legal Standard

In order to obtain a preliminary injunction, the moving party must prove:  "(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest."  *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).  "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation omitted).

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Federal Rules of Evidence thus do not apply in the context of a preliminary injunction motion and the Court "may consider sworn proof including affidavits, including those based upon information and belief or hearsay (though it may affect the weight given), depositions, transcripts of prior hearings and live testimony."  *Pharmanex, Inc. v. HPF*, 221 F.3d 1352, 2000 WL 703164, at *3 (10th Cir. 2000) (unpublished table decision); *APS BioGroup, Inc. v. Sterling Tech., Inc.*,

No. 1:19-CV-02952-RM-MEH, 2020 WL 5406128, at *3 (D. Colo. Sept. 9, 2020) (citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)).

### 2.    Application

Through the Injunction Motion, FAS seeks a preliminary injunction "to prevent [Frac Shack] and all those acting in participation or concert with [Frac Shack] from . . . sending letters of other similar types of communications to FAS's customers and potential customers threatening patent litigation."  [#55 at 1]  The requested injunction thus seeks to prohibit Frac Shack from notifying FAS's customers and potential customers that Frac Shack believes the FAS Equipment infringes its patents.

### a.    The Federal Patent Law's "Bad Faith" Requirement

As an initial matter, "when a preliminary injunction prevents a patentee from communicating its patent rights, a court applies 'federal patent law and precedent relating to the giving of notice of patent rights.'"  *Myco Indus., Inc. v. BlephEx, LLC*, 955 F.3d 1, 10 (Fed. Cir. 2020) (quoting *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1373 (Fed. Cir. 2007)).  Pursuant to the federal patent law, "[a] patentee has the right to inform a potential infringer of the existence of the patent, whereby the recipient of the information may adjust its activities, perhaps seek a license, or otherwise act to protect itself" and, as a result, "[f]ederal law has uniformly upheld a patentee's right to publicize the issuance of patents and to so inform potential infringers."  *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *see also GP Indus., Inc.*, 500 F.3d at 1374 (finding that "a patentee has a right to inform potential infringers of a patent and potentially infringing activity").

In light of these rights, "an injunction against communication is strong medicine that must be used with care and only in exceptional circumstances." *GP Indus., Inc.*, 500 F.3d at 1374.  Federal patent law thus "'requires a showing of bad faith' before a patentee can be enjoined from communicating his patent rights." *Myco Indus., Inc.*, 955 F.3d at 10 (quoting *GP Indus., Inc.*, 500 F.3d at 1373); *see also Mikohn Gaming Corp.*, 165 F.3d at 898 ("[F]ederal law requires a showing of bad faith in order to bar . . . communications" regarding notice of patent rights and potential infringement).  To establish "bad faith," the movant must demonstrate that "the claims [of patent rights and/or infringement] asserted were objectively baseless"—*i.e.*, that "no reasonable litigant could realistically expect success on the merits." *Myco Indus., Inc.*, 955 F.3d at 10.  Put another way, "communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication." *Id.* at 11 (quoting *Mikohn Gaming Corp.*, 165 F.3d at 897).

Here, FAS fails even to argue—let alone establish—that Frac Shack's communications to FAS's customers and potential customers regarding Frac Shack's alleged patent rights and potential claims for infringement were made in bad faith.[4]  Nor

---

[4] Indeed, frustratingly, neither party even mentions the "bad faith" requirement in their briefing on the Injunction Motion.  In its response to the Injunction Motion, Frac Shack states only that "[s]ome courts have held that . . . intellectual property rights owners have the right to defend themselves against infringement and to warn purchasers from the alleged infringer that they might also be liable to the IP owner through the sending of infringement letters" and cites a single, 1975 decision from the Northern District of Illinois. [#67 at 13-14]  In its reply, FAS incorrectly contends that the bad faith requirement is not relevant here because, in the case cited by Frac Shack, bad faith was considered in the context of unfair competition claims not present in the current lawsuit.  [#74 at 12-13] Notably, in *Myco Industries, Inc.*, the Federal Circuit reversed and vacated the district court's preliminary injunction order enjoining a patentee's communications with the movant's potential customers based upon the movant's failure to establish bad faith, even though "[t]he district court's likelihood of success determination on [the movant's] unfair competition claim [was] not at issue on appeal."  955 F.3d at 9 n.3.  Despite the parties'

does the current record permit such an inference.  The three letters Frac Shack sent to FAS's customers and potential customers submitted with the Injunction Motion all notify the recipients of the current litigation and that Frac Shack and FAS dispute "whether customers acquiring or using FAS [Equipment] are in any way covered by the [A]greement" and Frac Shack expressly represents that "[i]f FAS prevails . . . and it is ultimately determined that FAS customers are covered by the [A]greement, then Frac Shack will abide by that ruling."  [#50-6 at 2, 4-5, 6-7]  Although FAS obviously disagrees with Frac Shack's position regarding the scope of the Agreement, FAS has not identified any false statements in the letters or provided any evidence to support a finding that Frac Shack's contentions in the letters are objectively baseless.   That Frac Shack's legal position on the scope of its rights may ultimately be proven wrong is of no consequence. "[A] patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights even though he may misconceive what those rights are."  *GP Indus., Inc.*, 500 F.3d at 1374 (quoting *Mikohn Gaming Corp.*, 165 F.3d at 897); *see also id.* at 1375 (finding that patentee "is entitled to threaten suit if not in bad faith and not objectively baseless").  Accordingly, FAS has not established bad faith and thus may not obtain an injunction enjoining Frac Shack from communicating its patent rights.  "This alone warrants" denial of the Injunction Motion.  *Myco Indus., Inc.*, 955 F.3d at 11.

---

failure to properly raise the "bad faith" requirement, the Court must still apply it.  *See Myco Industries, Inc.*, 955 F.3d at 11 n.4 (rejecting contention that patentee "waived its argument that a showing of bad faith is a prerequisite to injunctive relief" because "there can be no waiver . . . of the Judge's duty to apply the correct legal standard" (quotation omitted)).

### b.    The Requirements for Obtaining Injunctive Relief

Even if the bad faith requirement were not applicable here, FAS still has not established its entitlement to the requested preliminary injunction.  "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."   *Schrier*, 427 F.3d at 1267. Accordingly, the Tenth Circuit has instructed that "'[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements' will be considered."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)).

To establish irreparable harm, "the movant 'must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'"  *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141 (quoting *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016)).  In addition, "[t]o constitute irreparable harm, an injury must be certain, great, actual and not theoretical."   *Schrier*, 427 F.3d at 1267 (quoting *Heideman*, 348 F.3d at 1189).  "[P]urely speculative harm does not amount to irreparable injury," but "a plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).  Demonstrating irreparable harm is "not an easy burden to fulfill."  *Id.*

Here, FAS contends that the Frac Shack communications sought to be enjoined "pose a threat to FAS's business because they make at least some of FAS's customers

afraid or hesitant to do business with FAS for fear of becoming involved in a patent infringement lawsuit."[5]  [#55 at 15]  FAS, however, has not offered any evidence that it has actually lost any business or that it faces a significant risk of losing business as a result of the letters Frac Shack sent.  Nor has FAS provided an affidavit from a single customer or potential customer stating that they are afraid or hesitant to do business with FAS as a result of the letters sent by Frac Shack.  Instead, FAS states only that the customers who received the letters "asked to speak with representatives of FAS about the Frac Shack letters."  [#53-5 at 3]  Such evidence is insufficient to establish the loss of any business let alone a loss of business so significant to constitute irreparable harm.[6] *See, e.g.*, *DTC Energy Grp., Inc.*, 912 F.3d at 1272 (finding plaintiff failed to demonstrate irreparable harm where "both the prior loss of [plaintiff's] customers and consultants and the general decline of [plaintiff's] value as a business can be quantified in money damages"); *Farm Bureau Prop. & Cas. Ins. Co. v. Biggs*, No. 2:20-CV-2558-HLT-KGG, 2021 WL 1348317, at *5-6 (D. Kan. Feb. 25, 2021) (finding the plaintiffs failed to

---

[5] FAS contends that the three letters already sent by Frac Shack constitute "a widespread pattern, rendering the harm irreparable."  [#55 at 15 n.3]  FAS has not offered any evidence to support this contention, however.  FAS does not, for example, provide any evidence to demonstrate that the three customers/potential customers contacted by Frac Shack have significant market share or that the letters prompted discussion throughout the market for the FAS Equipment.  [*See* #55 at 17 (stating "word of these letters can travel throughout the industry" without providing any evidentiary support)]  Nor has FAS supplemented the record with any additional letters sent by Frac Shack since the Injunction Motion was originally filed.

[6] FAS's reliance on *Cedar Band of Paiutes v. U.S. Department of Housing and Urban Development* ("*Cedar Band*") thus is misplaced.  [#55 at 15-16 (citing No. 4:19-CV-30-DN-PK, 2019 WL 3305919 (D. Utah July 23, 2019))]  In *Cedar Band*, the plaintiff presented evidence that the enjoined letter prohibited the plaintiff from "operating anywhere but on its reservation" and from "serving anyone but one of [its] enrolled members," that, within a short time, "almost every lender had stopped doing business with [the plaintiff]," and, even after the relationships with those lenders resumed, the plaintiff's "business [was] down 30 percent."  2019 WL 3305919, at *4.

Case 1:20-cv-01492-STV   Document 85   Filed 11/29/21   USDC Colorado   Page 12 of 27

demonstrate irreparable harm based upon "loss of customers and goodwill" where plaintiff "submitted evidence pertaining to only fourteen of [p]laintiffs' customers that [d]efendants allegedly solicited" and "only seven *canceled* their business with [p]laintiffs" (emphasis in original)).

FAS also argues that the letters sent by Frac Shack "are leading FAS to lose . . . control over . . . its business reputation and to lose goodwill, which has been found to constitute irreparable harm."  [#55 at 16]  FAS, however, provides no evidence to support this contention.  As noted above, the letters sent by Frac Shack expressly acknowledge that: (1) FAS and Frac Shack dispute the impact of the Agreement on downstream users of the FAS Equipment and (2) Frac Shack will abide by the Court's determination of the legal effect of the Agreement.[7]  [#50-6 at 2, 4-5, 6-7]  FAS does not provide any explanation for why its potential customers would be confused by Frac Shack's position or why they would be more likely to accept Frac Shack's interpretation of the Agreement than FAS's; nor is there any evidence in the record to support such a finding.  Instead, Plaintiff provides evidence only that the three companies that received the letters from Frac Shack asked to speak with representatives of FAS about the letters.  [#53-5 at 3]  There is no evidence to support a finding that FAS was unsuccessful in conveying its position to the companies during the requested discussions or that FAS otherwise lost control over its business or goodwill.  Indeed, at least one of the companies ultimately

---

[7] In its reply, FAS contends that the information provided by Frac Shack in the letters "is a different message than what the customer recipients would receive from publicly-available information because that information would be the agreed press release language which says the opposite—that FAS is free to sell or lease its products to these same customers."  [#74 at 12]  The press release, however, is not the only publicly-available information.  The parties' respective positions identified in the Frac Shack letters also are publicly-available through the parties' filings in this litigation.

decided a meeting with FAS representatives was not even necessary. [#50-7 at 8] The cases cited by FAS for the proposition that loss of control or goodwill can constitute irreparable harm thus are inapposite.[8] [*See* #55 at 16]

Accordingly, the Court finds that Plaintiff has not demonstrated that it will suffer irreparable harm in the absence of the requested preliminary injunction.[9]

### c. Conclusion

Because FAS has not satisfied its burden of demonstrating that the Frac Shack communications were sent in bad faith and/or that FAS will suffer irreparable harm, the Injunction Motion is DENIED.

### B. Summary Judgment Motion

### 1. Legal Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986);

---

[8] Specifically, all of the cases cited by FAS address loss of control and goodwill in the context of market confusion due to the misuse of a trademark. *See Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 136 (D. Colo. 1980) (finding irreparable harm where defendant "use[d] the [plaintiff's] trademark in a way that confuse[d] the public and deceive[d] the public into purchasing [a product with the plaintiff's trademark] of inferior quality"); *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1253 (D. Utah 2020) (finding irreparable harm based on "significant risk that [plaintiff] w[ould] lose control of its reputation" specific to alleged trademark infringement—*e.g.*, defendant with similar name offering similar products); *U.S. Truss Steel, Inc. v. Perka Bldgs. of N. Am., Inc.*, No. CIV. A. 90-2167-O, 1990 WL 94375, at *5 (D. Kan. June 18, 1990) (finding that plaintiff would "irreparably suffer, as a result of confusion in the marketplace, indeterminate losses in market position, sales, reputation and goodwill if defendants [were] not enjoined from continued use of plaintiff's advertising and promotional materials"). Here, there is no allegation of that type of market confusion—*i.e.*, that Frac Shack's actions or products are being attributed to FAS.

[9] The Court "need not address" the remaining three "preliminary injunction factors here because the [Court] has already determined [FAS] cannot show irreparable harm." *First W. Cap. Mgmt. Co.*, 874 F.3d at 1143.

*Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994).  If the moving party bears the burden of proof at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331).  "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987).  Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment must be based on more than mere speculation, conjecture, or surmise. *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could

return a verdict for either party. *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). In reviewing a motion for summary judgment, the Court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the non-moving party." *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

## 2. Application

Through the Summary Judgment Motion, FAS "seeks only a summary judgment as to Count I of the Complaint, that of declaratory judgment." [#52 at 6] FAS's declaratory judgment claim seeks a declaration that "the [C]ovenant [N]ot to [S]ue authorizes FAS to sell or lease the FAS Equipment, and that such sales or leases exhaust Frac Shack's rights in the patents named in the Agreement, such that Frac [S]hack cannot sue any customers, lessees, or users of that FAS Equipment." [#3, ¶ 46] In its Order on the Motion to Dismiss, the Court explained its understanding that "although the proposed declaration references the operation of the doctrine of patent exhaustion, the claim seeks a declaration of the parties' respective rights under the Agreement."[10] [#41 at 10] Despite the clear language of Count I seeking a declaration as to the meaning of the Covenant Not to Sue and the Court's guidance in its Order on the Motion to Dismiss, FAS confoundingly focuses its arguments in the Summary Judgment Motion on the operation of the legal doctrines of patent exhaustion and legal estoppel vis-à-vis the rights of

---

[10] "Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article." *Bowman v. Monsanto Co.*, 569 U.S. 278, 280 (2013).

downstream users of the FAS Equipment rather than focusing on the specific rights granted to FAS through the Covenant Not to Sue.[11]  To the extent the Summary Judgment Motion seeks a declaration regarding the application of patent exhaustion and/or legal estoppel to hypothetical claims of infringement Frac Shack may bring against FAS's customers, that request exceeds the scope of Count I as pled and raises standing issues not addressed in the Court's order on the Motion to Dismiss and thus is DENIED.[12]

Despite the Summary Judgment Motion's focus on these legal doctrines, however, the Summary Judgment Motion includes other language indicating that it does properly seek declaration regarding the parties' rights pursuant to the Covenant Not to Sue in the Agreement.  [*See, e.g.*, #52 at 8 ("In a case like this where patent exhaustion and legal estoppel derives from a settlement agreement, the interpretation of that agreement is a legal question for the Court."), 11 ("Under the facts of this case, the [Covenant Not to Sue] authorized sales by FAS for purposes of patent exhaustion.")]  The Court thus also

---

[11] The Summary Judgment Motion states, for example, that "[a]lthough Frac Shack may dispute the application of the patent exhaustion and legal estoppel doctrines, these are legal disputes and so appropriate for a summary judgment decision."  [#52 at 6]  In the Injunction Motion, FAS expressly argues that it has a strong likelihood of success on the merits of its claim for declaratory relief, because "Frac Shack's suing or threatening to sue FAS's customers or potential customers is unlawful under the settlement agreement because a lawsuit would ▓▓▓▓▓▓▓▓ FAS in a domestic or foreign legal or administrative proceeding, for or based on infringement of any of the Frac Shack Patent Rights."  [#55 at 13]  Strangely, FAS does not include this argument specific to the meaning of the Covenant Not to Sue in its Summary Judgment Motion [#52] and indicates in its reply in support of the Injunction Motion that FAS has "not addressed on summary judgment" its argument based upon the ▓▓▓▓▓▓ language in the Covenant Not to Sue [#74 at 5].

[12] Indeed, the Complaint makes no reference at all to the doctrine of legal estoppel [#3] and the Court explained in its Order on the Motion to Dismiss that it "does not understand FAS's claims to raise the defense of patent exhaustion on behalf of non-parties" [#41 at 20].

considers whether FAS is entitled to summary judgment on Count I to the extent it seeks a declaration of the parties' rights under the Covenant Not to Sue.

As noted above, the Covenant Not to Sue states: ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ [#52-2 at 3]  FAS contends that the Covenant Not to Sue should be interpreted: (1) to authorize FAS to sell or lease the FAS Equipment and (2) to prohibit Frac Shack from suing any customers, lessees, or users of the FAS Equipment, notwithstanding the lack of any express language in the Covenant Not to Sue to that effect.  [#52]  In the Order on the Motion to Dismiss, the Court found that it was "a reasonable interpretation that the Covenant Not to Sue—including ███████████████████████████ . . . authoriz[ed] FAS's sales and leases of the FAS Equipment and prohibit[ed] Frac Shack from suing FAS's customers, lessees, and users, as any such litigation may be inconsistent with the application of the doctrine of exhaustion and/or require FAS to become ███████████████ in that litigation." [#41 at 26-27]  In the context of the Motion to Dismiss, however, the Court found that it was "unnecessary . . . to resolve whether the language of the Covenant Not to Sue is susceptible to multiple reasonable interpretations such that it is ambiguous" and the Court declined to do so, particularly because Frac Shack had not offered an alternative interpretation of the Covenant Not to Sue.  [*Id.* at 27 n.14]  In the context of the instant Summary Judgment Motion, Frac Shack has now offered its own interpretation of the Covenant Not to Sue, arguing that "the plain language of the [Agreement] is clear . . . that it is a personal [Covenant Not to Sue] to FAS and the entities listed in section 2 of the Settlement Agreement" and that "the plain language of

the [Agreement] does not extend rights to other third parties such as customers of FAS." [#64 at 9-10]   The Court thus revisits its analysis of the proper interpretation of the Covenant Not to Sue in light of the parties' arguments in connection with the Summary Judgment Motion.

When interpreting contracts, "[t]he primary goal . . . is to determine and give effect to the intent of the parties."[13] *Vu, Inc. v. Pac. Ocean Marketplace, Inc.*, 36 P.3d 165, 167 (Colo. App. 2001).  As the Colorado Court of Appeals explained:

> Such intent is to be determined primarily from the language of the contract itself.  Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language.  Extrinsic evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract.  Absent any ambiguity, a court must not look beyond the four corners of the agreement to determine the meaning intended by the parties.

*Id.* (citing *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373 (Colo. 2000)).

"The fact that the parties have different opinions about the interpretation of the contract does not of itself create an ambiguity."  *May v. United States*, 756 P.2d 362, 369 (Colo. 1988).  Instead, "[t]erms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation."  *Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991) "To determine whether a contractual provision is ambiguous, 'the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all of the provisions of the agreement.'"  *Cornell v. Harmony Homes, Inc.*, No. 06-cv-00323-EWN-MEH, 2007 WL 38132, at *4 (D. Colo.

---

[13] The Agreement provides that it ███████████████████████████████████████ ██████████████████████████████████████████████████████ [#52-2 at 7]

Jan. 4, 2007) (quoting *May*, 756 P.2d at 369).  The Court must look to the entire document and may not "view[] clauses or phrases in isolation."  *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992).

FAS's interpretation of the Covenant Not to Sue is based primarily upon the Federal Circuit's interpretation of a similar covenant not to sue in *TransCore, LP v. Electronic Transaction Consultants Corp.*  [#52 at 11-16 (citing 563 F.3d 1271, 1274 (Fed. Cir. 2009))]   In *TransCore*, the plaintiff, a manufacturer of automated toll collection systems, entered into a settlement agreement with one of its competitors, Mark IV Industries ("Mark IV"), to resolve the plaintiff's patent infringement claims against Mark IV.  563 F.3d at 1273.  The settlement agreement included a covenant not to sue, pursuant to which the plaintiff agreed "not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of [certain patents]."  *Id.*  Several years later, the defendant contracted to set up and test toll-collection systems that had been purchased from Mark IV.  *Id.* The plaintiff then sued the defendant for infringement based upon the defendant's use of the Mark IV toll-collections systems.  *Id.*  The defendant filed a motion for summary judgment, "asserting that its activities were permitted by [the plaintiff's settlement agreement with Mark IV] under the related doctrines of patent exhaustion, implied license and legal estoppel."[14]  *Id.* at 1274.

In considering whether the covenant not to sue contained in the settlement agreement provided protection from suit to the downstream users of Mark IV's products, the Federal Circuit explained that "a non-exclusive patent license is equivalent to a

---

[14] Although patent exhaustion arose in *TransCore* as a defense and is often referred to as an affirmative defense, the Supreme Court has described patent exhaustion as a "limit" on a patent holder's rights that "functions automatically."  *Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1531 (2017).

covenant not to sue" and "an unconditional covenant not to sue authorizes sales by the covenantee for purposes of patent exhaustion."   *Id.* at 1274, 1275.   As a result, it is unimportant "whether an agreement is framed in terms of a 'covenant not to sue' or a 'license,'" because the "difference is only one of form, not substance—both are properly viewed as 'authorizations.'"   *Id.* at 1276.   Instead, "the pertinent question . . . is not whether but what the . . . settlement agreement authorizes" and "[m]ore specifically, [did] the . . . settlement agreement authorize" the sale of the allegedly infringing products.   *Id.*

In answering those questions with regard to the settlement agreement between the plaintiff and Mark IV, the Federal Circuit found that "[t]he language of the . . . settlement agreement is unambiguous:   '[the plaintiff] agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement . . .'"   *Id.* Based upon this language, the Federal Circuit concluded that the covenant not to sue, "without apparent restriction or limitation, thus authorize[d] all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing."   *Id.*   Accordingly, the Federal Circuit found that "Mark IV's sales . . . were authorized and that [the plaintiff's] patent rights [we]re exhausted."   *Id.* at 1277.

FAS argues that, in light of the Federal Circuit's interpretation of the covenant not to sue in *TransCore* and the application of the doctrine of patent exhaustion, the Covenant Not to Sue here should thus also be interpreted to authorize FAS to sell and lease the FAS Equipment.   The Court agrees.

As an initial matter, the Court finds that the Covenant Not to Sue that Frac Shack granted to FAS in the Agreement is broader than the covenant not to sue the plaintiff granted to Mark IV in TransCore, because Frac Shack agreed ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ [#52-2 at 3 (emphasis added)], whereas the plaintiff in *TransCore* agreed only "not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement," 563 F.3d at 1273.  As the Court explained in its Order on the Motion to Dismiss, "the use of the phrase ████████████████ clearly contemplates a Covenant Not to Sue that is broader than just prohibiting Frac Shack from directly suing FAS (and its related entities and affiliates as defined in the Agreement) for patent infringement."  [#41 at 26]  The Court thus has already rejected the interpretation of the Covenant Not to Sue offered by Frac Shack in its opposition to the Summary Judgment Motion—*i.e.*, that the Covenant Not to Sue is limited to "a personal covenant not to sue . . . FAS and other listed entities that are related to FAS."  [#64 at 10]

Frac Shack contends that the Covenant Not to Sue should be given such a limited interpretation because it "clearly describes the entities and individuals that Frac Shack agreed not to sue" and "does not list customers of FAS" or "specify any particular products of FAS that would be covered by the covenant."  [*Id.*]  But the same was true of the covenant not to sue at issue in *TransCore*.  Despite the covenant not to sue expressly stating only that the plaintiff would "not . . . bring any demand, claim, lawsuit, or action against Mark IV for future infringement"—without any reference to Mark IV's customers or products, the Federal Circuit found that the language of the agreement was "unambiguous" that the covenant not to sue "authorize[d] all acts that would otherwise be infringements," including the sale of Mark IV's products to customers.  *TransCore*, 563 F.3d at 1276.  In so holding, the Federal Circuit noted that the plaintiff "did not, as it could

have, limit this authorization to, for example, 'making' or 'using'" the Mark IV products.  *Id.*

In the Covenant Not to Sue at issue here, Frac Shack similarly agreed not to bring any

infringement action against FAS without limiting the corresponding authorization granted

by the Covenant Not to Sue.  The Court thus finds unpersuasive Frac Shack's contention

that "there is no basis for FAS to assert that the [Covenant Not to Sue] extends to its

customers or their use of any FAS [E]quipment" and the Covenant Not to Sue should be

limited only to a personal covenant not to sue the specific entities listed in the Agreement.

[#64 at 10]

Frac Shack argues that the Federal Circuit's decision in *TransCore* is inapplicable

here, because the Agreement contains a provision that ███████████████████████████

███████████████████████████████ . . in contrast to the agreement in *TransCore*

in which the Federal Circuit found there to be an unconditional covenant not to sue."[15]

[*Id.* at 14]  The provision referenced by Frac Shack is ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ [#52-2 at 7]  Aside

---

[15] Frac Shack also argues that the court in *TransCore* "disregarded the parole [sic] evidence provided by the plaintiff to establish the intent of the parties with respect to the covenant not to sue . . . based on California law," whereas "[i]n the present case, which is governed by Colorado law, parole [sic] evidence can be considered in resolving an ambiguity in a contract such as the [Covenant Not to Sue]."  [#64 at 14]  Under Colorado law, "[a] court should only admit parol evidence when the contract between the parties is so ambiguous that their intent is unclear."  *Boyer v. Karakehian*, 915 P.2d 1295, 1299 (Colo. 1996).  "Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation."  *Hecla Min. Co.*, 811 P.2d at 1091.  Here, as discussed above, Frac Shack has not offered an alternative reasonable interpretation of the Covenant Not to Sue and, thus, the Court—like the Court in *TransCore*—may not consider parol evidence.  563 F.3d at 1276, 1277 (finding language of covenant not to sue "unambiguous" and thus finding no error in district court's decision not to admit the plaintiff's parol evidence).

from pointing out the existence of this language, Frac Shack fails to offer any explanation for how or why it negates, modifies, or limits the scope of the Covenant Not to Sue and the Court is aware of none.[16]   Indeed, the settlement agreement at issue in *TransCore* included a similar provision separate from the covenant not to sue that stated:  "No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release."   563 F.3d at 1273.   The Federal Circuit found that this language "refer[red] only to the effect of the Release provision and thus [did] not require a different result."  *Id.* at 1277.   Although ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ like the provision in *TransCore*, it is separate from the Covenant Not to Sue and, as the Federal Circuit explained in *TransCore*, "the pertinent question . . . is . . . what the [Agreement] authorizes."  563 F.3d at 1276.  The distinction between a license

---

[16] The Court disagrees with Frac Shack's contention that "[t]he facts of the case here are more similar to those in the *Exelis* case which distinguished the facts in *TransCore*."  [#64 at 15 (citing *Exelis Inc. v. Cellco P'ship*, No. CA 09-190-LPS, 2012 WL 5289709 (D. Del. Oct. 9, 2012))]   In *Exelis*, the court found that manufacturers of mobile phones—which entities were *upstream* from the cellular network that had obtained a covenant not to sue as part of a settlement agreement with the plaintiff—were not entitled to judgment on the pleadings based on the doctrine of patent exhaustion, because they "ha[d] not identified any 'authorized sale' of a mobile device (even for use on the . . .  network) that would trigger application of the patent exhaustion doctrine."   2012 WL 5289709, at *4.   The *Exelis* court left open the possibility, however, that the mobile phone manufacturers may ultimately be entitled to a finding of patent exhaustion with respect to claims of infringement based upon the use of the manufacturers' mobile phones that consumers purchased from the cell phone network based upon the covenant not to sue between the network and the plaintiff.  *Id.* at *4 n.7.  More importantly, the parties to the covenant not to sue at issue in *Exelis* "expressly agreed that [the plaintiff's] covenant not to sue [the network or the network's customers] does not extend to or operate as a license, express or implied, to the manufacturers or suppliers of products for use in [the network's] wireless networks."  *Id.* at *5 (quotation and emphasis omitted).  As explained above, no such express intent or limitation is included either in the Covenant Not to Sue or elsewhere in the Agreement.  To the contrary, the parties agreed to a Press Release stating that the Agreement "expressly permitted [them] to manufacture, use, sell, lease, and license their respective mobile automated fuel distribution units utilized in the fracking industry."  [#52-2 at 16]

and a covenant not to sue "is only one of form, not substance."  *Id.*  Here, there is no indication that the ███████████████ provision was intended to modify or limit the effect of the Covenant Not to Sue, which, as explained above, "authorizes all acts that would otherwise be infringements," including FAS's sales and leases of the FAS Equipment.  *See TransCore*, 563 F.3d at 1276.

Frac Shack thus has not offered either a legitimate basis for distinguishing the Federal Court's interpretation of the covenant not to sue at issue in *TransCore* or a reasonable alternative interpretation of the Covenant Not to Sue in this case.  Accordingly, consistent with *TransCore*, the Court finds that the Covenant Not to Sue, "without apparent restriction or limitation, . . . authorizes all acts [by FAS] that would otherwise be infringements," including the lease and sale of FAS Equipment.[17]  *Id.*

The Court notes that this interpretation of the Covenant Not to Sue, which authorizes FAS to sell and lease the FAS Equipment, is consistent with the Press Release the parties agreed upon and attached as an exhibit to the Agreement.  [*See* #71-1, SOF9; #52-2 at 16]  Specifically, the Press Release states that, pursuant to the Agreement, "both Parties are expressly permitted to manufacture, use, sell, lease, and license their respective mobile automated fuel distribution units utilized in the fracking industry."  [#52-

---

[17] In its Motion to Dismiss, Frac Shack argued that FAS's allegations that it leased the FAS Equipment were insufficient to satisfy the "unconditional sale" requirement for application of the doctrine of patent exhaustion.  [#14 at 16-17]  In the Summary Judgment Motion, FAS argues that "FAS typically leases [the FAS Equipment] to its customers" and that such leases "constitute[ ] a sale because the Federal Circuit and other courts have construed a lease to constitute a sale for purposes of patent infringement."  [#52 at 13]  In response, Frac Shack does not argue that FAS's leases of the FAS Equipment should be treated differently than sales or otherwise ask the Court to draw a distinction between leases and sales in resolving the Summary Judgment Motion.  The Court thus accepts FAS's position that its leases of the FAS Equipment are equivalent to sales for purposes of applying the Federal Court's order in *TransCore*.

2 at 16]  In its response to the Summary Judgment Motion, Frac Shack contends that "the proposed press release does not impact the actual terms of the agreement and the intent of the parties" and should be "disregard[ed]" by the Court, but Frac Shack provides no factual explanation or legal support for that position.[18]  [#64 at 13]  Contrary to Frac Shack's contention, in interpreting the Covenant Not to Sue, the Court must look to the entire Agreement and may not "view[] clauses or phrases in isolation."  *U.S. Fid. & Guar. Co.*, 842 P.2d at 213.  The Court thus finds it appropriate to consider the Press Release, which is included in the Agreement, when interpreting the Covenant Not to Sue.

---

[18] Although "extrinsic evidence cannot be used to vary the terms of a written contract" unless the contract is ambiguous, "a court may conditionally admit extrinsic evidence to determine whether the contract is in fact ambiguous."  *Gol TV, Inc. v. EchoStar Satellite Corp.*, 692 F.3d 1052, 1055 (10th Cir. 2012).  In support of its opposition to the Summary Judgment Motion, Frac Shack submitted a declaration from Joshua S. Wyde—one of the attorneys for Frac Shack "involved in the negotiation of [the Agreement]."  [#64-1, ¶ 2] Mr. Wyde testified that the Covenant Not to Sue and ████████████████████████ ████████████████████ were both drafted by FAS.  [*Id.* at ¶¶ 3-4]  Mr. Wyde further testified that he "interpret[s] the [Covenant Not to Sue] as personal to FAS and the other entities and individuals listed in Section 2, and no others" [*id.* at ¶ 7], but he does not explain the basis for that interpretation (especially in light of the Federal Circuit's decision in *TransCore*) or indicate that his interpretation was ever shared or discussed with Frac Shack.  Mr. Wyde also contends that "FAS and FAS' counsel never communicated to [him] that they understood the language of the [Covenant Not to Sue] would extend to, or give any rights to, any other third parties, such as customers of FAS, or that the [Covenant Not to Sue] would enable FAS to grant such rights to third parties." [*Id.* at ¶ 6]  Such testimony strains credulity given that the draft settlement agreement FAS sent to Mr. Wyde during the negotiations included as an exhibit a proposed press release that stated in plain language:  "Under the terms of the Settlement Agreement, . . . both Parties are expressly permitted to manufacture, use, sell, lease, and license their respective mobile automated fuel distribution units utilized in the fracking industry."  [#64-2 at 12; #64-3]  That same language was agreed to by Frac Shack and included in the executed Agreement.  [#52-2 at 16]  Thus, even if the Court were to consider the parol evidence submitted by Frac Shack, it is insufficient to establish any ambiguity and offers no explanation for why the Court should disregard the Press Release.  To the contrary, Mr. Wyde's declaration and the attachments make clear that the Press Release was a component of the Agreement from its inception.  [#64-2, 64-3]

For these reasons, the Court GRANTS the Summary Judgment Motion to the extent it seeks a declaration that the Covenant Not to Sue authorizes FAS to sell or lease the FAS Equipment.  To the extent the Summary Judgment Motion further seeks a declaration that "such sales or leases exhaust Frac Shack's rights in the patents named in the Agreement" and/or "that Frac [S]hack cannot sue any customers, lessees, or users of that FAS Equipment" [#3, ¶ 46], FAS has not tied these requests to the language of the Covenant Not to Sue[19] or otherwise provided authority for the Court to issue an injunction prohibiting Frac Shack from suing the non-party customers or from declaring what effect the Covenant Not to Sue ultimately would have on any hypothetical infringement claims asserted against those customers.  The Summary Judgment Motion thus is DENIED to the extent it seeks such declarations.

## III.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED**:

1.  Plaintiff's Motion for Preliminary Injunction [##53, 55] is **DENIED**;

2.  Plaintiff's Motion for Partial Summary Judgment for Declaratory Relief [## 50, 52] is **GRANTED IN PART** to the extent it seeks a declaration that the Covenant Not to Sue authorizes FAS to sell or lease the FAS Equipment but is **DENIED IN PART** to the extent it seeks a further declaration as to the application of the legal doctrines or patent exhaustion and legal estoppel and/or an injunction enjoining Frac Shack from suing FAS's customers; and

---

[19] As noted above, FAS did not make any argument specific to the ███████████ language included in the Covenant Not to Sue in its Summary Judgment Motion.  *See supra* note 11.

3.      The Clerk of Court shall file this Order under Restriction Level 1 and, within 14 days of the filing of this Order, the parties shall file a joint motion to restrict pursuant to D.C.COLO.LCivR 7.2 that attaches as an exhibit a proposed redacted version of the order reflecting both parties' proposed redactions.

DATED: November 10, 2021                    BY THE COURT:

                                            s/Scott T. Varholak
                                            United States Magistrate Judge